IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANNE GRESSER | : | |
| | : | |
| v. | : | Civil No. CCB-12-987 |
| | : | |
| WELLS FARGO BANK, N.A. | : | |

## MEMORANDUM

Plaintiff Anne Gresser brings this action on behalf of a putative class of bondholders alleging that, under an indenture with failed sub-prime mortgage lender KH Funding ("KH"), defendant Wells Fargo breached its duties as indenture trustee. Wells Fargo has filed a motion for judgment on the pleadings seeking to dismiss Gresser's claims. (ECF No. 61.) For the reasons set forth below, Wells Fargo's motion will be denied.

## BACKGROUND

KH was a Maryland sub-prime mortgage lender and bond issuer. (Compl., ECF No. 1, ¶¶ 4-5; KH 2008 10-K Statement ("2008 10-K"), ECF No. 61, Ex. 11, at 6-8.)[1] On August 4, 2004, KH entered into an indenture with defendant Wells Fargo under which it issued "Series 3 Senior Secured Investment Debt Securities" ("Series 3 Notes") and "Series 4 Subordinated Unsecured Investment Debt Securities ("Series 4 Notes"). (Compl. ¶¶ 4, 5.) Plaintiff Anne Gresser is a holder of Series 3 Notes that had, at one time, over $1 million in face value. (*Id.* ¶ 3.)

---

[1] There is a discrepancy between the page numbering of the exhibit and the original SEC filing. Page references here align with the exhibit, not the original document.

The indenture was made pursuant to the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. § 77aaa *et seq.*, which it incorporates by reference. (*Id.* ¶ 11; Indenture, ECF No. 61, Ex. 2, § 1.3.) Under the indenture, which has been amended several times but not substantively altered, Wells Fargo undertook a variety of duties and obligations as indenture trustee. (Compl. ¶¶ 12-18.) These duties include an obligation, in the event of a default, to protect the value of the Notes on behalf of their holders by "exercis[ing] such of the rights and powers vested in it by this [i]ndenture, and us[ing] the same degree of care in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." (Compl. ¶ 12; Indenture § 7.1(a).) This obligation is triggered only by an "Event of Default," a term formally defined in the indenture that includes any failure by KH "to pay interest and/or principal due on the Notes for a period of 30 days." (Compl. ¶ 13; Indenture § 6.1.) Wells Fargo also had a duty to notify Series 3 noteholders of the existence of any default or Event of Default. (Compl. ¶ 15; Indenture § 10.13(b).) The indenture further provides that Wells Fargo "may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that . . . [it] shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that [it] was negligent in ascertaining the pertinent facts." (Compl. ¶ 17; Indenture § 7.1(c).)

On May 18, 2005, Wells Fargo, as indenture trustee, "filed an original financing statement . . . with the Maryland Department of Assessment and Taxation" on behalf of Series 3 noteholders. (Compl. ¶ 46.) By filing the statement, "Wells Fargo perfected liens on and security interests in" a variety of collateral held by KH for the benefit of Series 3 noteholders. (*Id.* ¶ 47.) Under Maryland law, Md. Code Ann., Comm. Law, § 9-515(a), a financing statement is only effective for five years from the date of filing. Wells Fargo did not file a continuation statement

within five years and allowed the Series 3 noteholders' lien and security in the collateral held by KH to lapse. (*Id.*) Wells Fargo eventually filed a second financing statement on September 7, 2010, less than 90 days before KH filed for bankruptcy. (*Id.* ¶ 49.)

KH suffered a series of mounting losses beginning in 2007 and coinciding with the financial crisis. (Compl. ¶¶ 36-45.) KH reported these losses to the SEC. (*Id.*) Beginning with the 2008 10-K it filed on April 15, 2009, KH also reported continuing Events of Default to the SEC. (*Id.* ¶¶ 21-25; 10-K at 17.) For example, on May 20, 2009, KH reported to the SEC "it was subject to approximately $1.5 million in redemption requests for Series 3 Notes that were past the 30-day grace period." (Compl. ¶ 22.) On December 23, 2009, KH reported "it received notice from Wells Fargo that Wells Fargo had declared an event of default under the Indenture and that Wells Fargo intended to mail notice of such event of default to holders of the Notes." (Compl. ¶ 25.) Wells Fargo had taken no action with respect to any default up until this date. (*Id.* ¶¶ 25, 27.) On January 7, 2010, Wells Fargo notified holders that an Event of Default was occurring, and on February 5, 2010, citing its powers under the indenture, Wells Fargo gave notice it was accelerating the notes because KH "has defaulted in the payment of principal and interest on the [Notes] . . . for a period of at least 30 days, and, therefore, Events of Default have occurred and are continuing." (*Id.* ¶ 28.)

On December 3, 2010, KH filed for bankruptcy. (*Id.* ¶ 50.) Because Wells Fargo failed to continue the first financing statement, and because it had filed the second financing statement less than 90 days before KH filed for bankruptcy, KH sought in a Complaint to Avoid Preferential Transfer, under a provision of the U.S. Bankruptcy Code, to avoid application of the lien against its assets created by the second financing statement. (*Id.* ¶¶ 51-52.) In its answer to KH's complaint, Wells Fargo admitted it did not file the second financing statement within five

3

years of filing the first statement. (*Id.* ¶ 53) Wells Fargo and KH filed a stipulation and consent order, which was entered on May 17, 2011, under which Series 3 noteholders lost secured creditor status with respect to any of KH's assets except for two deposit accounts with a combined value of less than $55,000. (*Id.* ¶¶ 54-56.)

Subsequently, Gresser commenced this action on behalf of herself and all other Series 3 noteholders as of February 5, 2010. (*Id.* ¶ 62.) Gresser alleges that Wells Fargo breached its contractual duties to Series 3 noteholders, as third-party beneficiaries of the indenture, "by its recurrent failure to exercise its rights and powers under the Indenture despite its knowledge of repeated and continuing events of default . . ." (*Id.* ¶ 74.) Gresser also alleges that Wells Fargo breached its contract, or alternatively breached its duty of care as a fiduciary, by failing to file a continuation of the first financing statement leading to "a lesser recovery from [KH's] bankruptcy estate" for Series 3 noteholders. (*Id.* ¶¶ 78-81.)

## ANALYSIS

### I. Standard of Review

Motions for judgment on the pleadings under Fed. R. Civ. P. 12(c) are decided under the same standard as motions to dismiss under Rule 12(b)(6). *Independence News, Inc. v. City of Charlotte*, 568 F.3d 148, 154 (4th Cir. 2009). The purpose of a motion to dismiss "is to test the legal sufficiency of a complaint' and not to 'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir.2006) (quoting *Edwards v. City of Goldsboro*, 178 F .3d 231, 243–44 (4th Cir.1999)). To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)). The court assumes the facts alleged in the complaint are true and draws all reasonable factual inferences in the nonmoving party's favor. *Edwards*, 178 F.3d at 244. "[W]hen a defendant attaches a document [such as the Indenture] to its motion to dismiss, a court may consider it in determining whether to dismiss the complaint if it was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity." *Am. Chiropractic Ass'n v. Trigon Healthcare Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (internal quotations omitted). A complaint need not provide "detailed factual allegations," but it must "provide the grounds of [the plaintiff's] entitlement to relief" with "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (internal quotations omitted).

## II. Breach of Contract Claim

Gresser adequately states a claim for breach of contract as a third party beneficiary of Wells Fargo's agreement with KH. Under the indenture, "except during the continuance of an Event of Default[,]" Wells Fargo's obligations are limited to "those duties . . . specifically set forth in [the indenture] and no others, and no implied covenants or obligations" are to be read into the indenture. (Indenture § 7.1(b).) During an Event of Default, however, this provision does not apply, and Wells Fargo's obligations are not limited to express provisions of the indenture. Instead, Wells Fargo is to be held to a "prudent man" duty of care in determining its liabilities for actions taken or not taken to protect the interests of noteholders. (Indenture § 7.1(a).) Thus, in order to state a claim for breach of the indenture as a noteholder, Gresser must plead that (1) an Event of Default occurred and was continuing as defined by the agreement; (2) Wells Fargo was

aware of the continuance of an Event of Default; and (3) Wells Fargo then breached its duty of care by its actions or failure to act.[2]

Gresser's complaint easily satisfies the first requirement: she cites five KH SEC filings, beginning in April 2009, that report various amounts of at least $1.75 million of interest and principal payments that were more than 30 days late. (Compl. ¶¶ 21-25.) Section 6.1 of the indenture defines an "Event of Default" as, among other possibilities, "defaults in the payment of interest" or "defaults in the payment of the principal of any Security when the same becomes due and payable at maturity . . . and the Default continues for a period of 30 days . . ." Wells Fargo's heightened duties under the indenture are only triggered by "the continuance of an Event of Default." (Indenture § 7.1(b).) Taking the SEC filings as accurate, there were at least five instances where an Event of Default was continuing—the dates on which KH reported to the SEC that it was past the 30 day grace period in principal and loan payments.

Wells Fargo argues that Gresser's complaint fails to plead a continuing Event of Default because she does not address whether the late payments had been cured or waived. First, even if, after making its SEC filings, KH had immediately cured the defaults by paying the due amounts, an Event of Default was continuing under the indenture up until that moment. The same is true if a majority of noteholders had waived the defaults immediately following the SEC filings.[3] Thus, the complaint sufficiently pleads the existence of uncured and unwaived Events of Default.

---

[2] Wells Fargo erroneously states that Gresser also must plead specific damages. While Gresser does assert that Wells Fargo's inaction adversely affected the value of her Series 3 Notes, "[i]n a breach of contract action, the plaintiff need not prove damages resulting from the breach." *Ambling Management Co. v. Univ. View Partners, LLC*, 581 F. Supp. 2d 706, 718 (D. Md. 2008) ("A plaintiff may recover nominal damages, even though he has not shown actual damages.") (citing *Taylor v. Nations Bank, N.A.*, 776 A.2d 645, 651 (Md. 2001); *Hooton v. Kenneth B. Mumaw Plumbing & Heating Co., Inc.*, 318 A.2d 514, 518 (Md. 1974)).

[3] Wells Fargo appears to erroneously interpret § 6.4 of the indenture to permit waiver of late payments by individual noteholders. Section 6.4 states: "[h]olders of a majority . . . may waive an existing Default or Event of Default and its consequences except a continuing Default or Event of Default in the payment of the principal or of interest on any Security held by a non-consenting holder." In other words, a majority may waive any default unless an individual noteholder owed a late payment objects to such a waiver. The indenture is silent as to whether an individual noteholder can unilaterally waive an Event of Default based on a late payment of the principal or interest owed to him.

Regardless, Gresser was under no obligation to raise the possibility that the Events of Default were cured or waived. On its face, her complaint contains multiple, plausible assertions that Events of Default were continuing well before Wells Fargo took action to address them. Whether or not these defaults were actually being cured or waived is a factual dispute that cannot be resolved in this motion.

The same is true with regard to whether or not Wells Fargo had notice that Events of Default were occurring. Wells Fargo argues that Gresser's only allegation that the trustee was aware of the continuing Events of Default is that KH indicated it was in default in its SEC filings. Wells Fargo points to § 4.3 of the indenture and a New York Court of Appeals case to show that it was under no duty to review KH's SEC filings. *See Racepoint Partners, LLC v. JP Morgan Chase Bank, N.A.*, 928 N.E.2d 396, 398-99 (N.Y. 2010). This may be true, but it does not necessarily follow that because Wells Fargo did not *need* to review the filings the fact that it received the filings has no bearing on the plausibility of Gresser's claim. Because Wells Fargo received them, it is plausible that they made the trustee aware of KH's defaults.

Furthermore, the complaint not only alleges that Wells Fargo was notified of the defaults because it received the SEC filings; the complaint also alleges that KH directly informed Wells Fargo of its defaults. (*See* Compl. ¶¶ 21-24.) The complaint alleges repeatedly that "KH funding stated [in its SEC filings] that it informed Wells Fargo of [the nonpayment of principal and interest]." (*Id.*) Taken as true, these statements indicate that Wells Fargo was notified of Events of Default for months prior to giving notice to Series 3 holders or accelerating the notes.

As to wrongdoing, Gresser's complaint describes three failures to act on the part of Wells Fargo that plausibly state a claim for breach of its duties under the indenture. First, the complaint alleges that Wells Fargo did not accelerate the notes until February 5, 2010, almost a year after

7

Gresser alleges Wells Fargo first became aware of continuing Events of Default. (Compl. ¶¶ 25, 28.) Wells Fargo attempts to litigate the merits of this claim by arguing that individual noteholders never exercised their own power to accelerate, suggesting that it would have been imprudent for Wells Fargo to do so. Whether Wells Fargo breached its duty of care by not accelerating the notes is a factual question that cannot be resolved in this motion. It is, however, a plausible ground for Gresser's claim.

Second, Wells Fargo allegedly failed to give notice of Events of Default to Series 3 holders as required by § 10.13(b) of the indenture. (Compl. ¶ 27.) Wells Fargo contends that Gresser did not adequately plead this claim because the complaint only alleges that the trustee failed "to exercise its rights and powers under the [i]ndenture" and that giving notice "is a duty, not a right or power." (Def.'s Mot. J. Pleadings, ECF. No. 68, at 11.) But, in an Event of Default, § 7.1 is not limited to enumerated powers, and "implied covenants or obligations" may be read into the indenture. (Indenture §§ 7.1(a)-(b).) Thus, this section fairly encompasses the express duty to notify Series 3 holders contained in § 10.13(b) of the indenture, and this is an additional ground upon which Gresser plausibly states a claim for breach. *See In re Bankers Trust Co.*, 450 F.3d 121, 129 (2d Cir. 2006) (finding indenture trustee breached duty to give noteholders notice of default).

Third, the complaint plausibly alleges that Wells Fargo's failure to file a continuance of the first financing statement was a breach of § 7.1 of the indenture. The indenture contains no provision that requires Wells Fargo to file such a statement. On this basis, Wells Fargo argues that § 7.1(a), which requires the trustee to "exercise such rights and powers vested in it by [the indenture,]" "expressly" limits Wells Fargo's duties to specific provisions of the indenture and that Gresser is wrongly attempting to "transform the duty into one with undefined and unlimited

8

scope." (Def.'s Reply Mem., ECF No. 68, at 13.) But, a broad duty of care is precisely what § 7.1(a) appears to place on Wells Fargo during an Event of Default. Section 7.1(b) states: "*Except* during the continuance of an Event of Default . . . [t]he duties of [Wells Fargo] shall be determined solely by express provisions of the [i]ndenture and . . . no implied covenants or obligations shall be read into this [i]ndenture . . ." (emphasis added). It follows that, during an Event of Default, implied covenants or obligations can be read into the indenture. Though Maryland law is relatively silent as to the obligations of indenture trustees, a broad, fiduciary-like duty to protect noteholder interests seems to be what the TIA intended to vest in indenture trustees during defaults.[4] Thus, Wells Fargo's attempt to limit the term "rights and powers vested in it by [the indenture]" to only an express set of powers conflicts with § 7.1 as a whole.

Furthermore, Wells Fargo seems to have believed that filing a financing statement was not beyond its powers under the indenture, because it undertook to file the first statement in 2005 as a means of securing noteholder interests. At that time, a default was not occurring and Wells Fargo was under no obligation to do so. Once an Event of Default was occurring, however, Wells Fargo's duty to protect noteholder interests vested, and it is plausible that it breached this duty by failing to file a continuance of the financing statement. In fact, Wells Fargo did eventually file a second financing statement shortly before KH filed for bankruptcy, suggesting Wells Fargo believed it was prudent under the indenture to do so. Wells Fargo's alleged failure to file a timely continuance of the financing statement, according to the complaint, hindered its efforts to recover for the Series 3 noteholders in KH's bankruptcy proceedings. This is a third plausible ground for Gresser's claim.

---

[4] *See* Steven L. Schwarcz & Gregory M. Sergi, Bond Defaults and the Dilemma of the Indenture Trustee, 59 Ala. L. Rev. 1037, 1044-45 (2008) (stating that during the development of the TIA, the SEC suggested that indenture trustees "be transformed into active trustees with the obligation to exercise the degree of care and diligence which the law attaches to such high fiduciary position[s]." (citation omitted)). Wells Fargo attached this law review article to its Reply Memorandum.

**III. Tort Claim**

Specifically citing Wells Fargo's alleged failure to continue the first financing statement, the complaint also states a tort claim for breach of fiduciary duty. Wells Fargo argues that Gresser's tort claim fails because, under Maryland law, it owed no tort duty to noteholders independent of the indenture and because the economic-loss rule precludes recovery in tort. At this stage, the court need not decide whether Wells Fargo owed an independent fiduciary duty to Gresser that could give rise to tort liability. It is enough to recognize that Maryland law "contemplates tailored claims for a breach of fiduciary duty that are tied to discrete harms capable of being rectified by an appropriate remedy," *In re LandAmerica Fin. Group, Inc.*, 470 B.R. 759, 794-95 (E.D. Va. 2012), and that, because the TIA contemplates indenture trustees as fiduciaries, there may be a sufficient nexus between the noteholders and Wells Fargo such that the economic loss rule should not apply, *see Nat'l Labor College, Inc. v. Hillier Group Architecture, N.J., Inc.*, 739 F. Supp. 2d 821, 832-33 (D. Md. 2010). If a fiduciary relationship between Gresser and Wells Fargo exists, the failure to file a financing statement is a plausible basis for tort liability under the indenture's duty of care. *See Chemical Bank v. Sec. Pac. Nat. Bank*, 20 F.3d 375, 377 (9th Cir. 1994) ("[b]eyond question [the defendant] acted negligently" by failing to file a financing statement).

**IV. "Good Faith"**

Finally, Gresser's complaint will not be dismissed for failing to plead specific facts that show Wells Fargo did not act in good faith. Section 7.1(c)(2) of the indenture provides that Wells Fargo "shall not be liable for any error of judgment made in good faith." The TIA itself provides that all indentures "shall automatically be deemed . . . to contain provisions protecting the indenture trustee from liability for any error of judgment made in good faith by a responsible

10

officer . . ." 15 U.S.C. § 77ooo(d)(2). Wells Fargo contends that these provisions place a burden on the party seeking indenture trustee liability to plead facts that show a lack of good faith and that Gresser's complaint is, at most, conclusory in this regard. In this context, however, good faith more likely constitutes an affirmative defense. *See CFIP Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 473 n.26 (S.D.N.Y. 2010) (construing a nearly identical provision in a trust agreement as an affirmative defense).

Eventually, Gresser may be unable to prevail if Wells Fargo shows it consciously decided not to give bondholders notice of defaults, not to accelerate the notes prior to February 2010, and not to file a continuance of the financing statement. If these omissions were "judgment[s]" made by an officer or officers of Wells Fargo, then it may be entitled to a presumption that they were made in good faith, regardless of their wisdom. *See Speers Sand & Clay Works, Inc. v. American Trust Co.*, 20 F.2d 333, 335 (4th Cir. 1927).

But, Gresser does not merely allege that Wells Fargo made unwise or imprudent decisions in carrying out its duties under the indenture; rather, she alleges that Wells Fargo failed to address KH's defaults at all. While it is possible that Wells Fargo's omissions were choices entitled to protection under the "good faith" language of the indenture and TIA, it is equally plausible that they were not "error[s] in judgment" and that Wells Fargo simply ignored KH's defaults. Dismissing Gresser's claims on good faith grounds would require the court to find, as fact, that an officer or officers of Wells Fargo assessed KH's defaults and consciously decided to forgo action. *Cf. CFIP Master Fund, Ltd.*, 738 F. Supp. 2d at 473-74 (granting summary judgment that defendant trustee acted in good faith after finding that "[t]he undisputed record shows that . . . [the defendant] made the decision" to take the allegedly negligent action after

"conferring with outside counsel" and "asking . . . for further explanation"). At this stage, such a factual finding would be inappropriate.

## **CONCLUSION**

For the forgoing reasons, Wells Fargo's motion for judgment on the pleadings will be denied.

A separate order follows.

      10/22/12                                                                           /s/

Date                                                                               Catherine C. Blake
                                                                               United States District Judge